**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION AT LEXINGTON**
**CASE NO. _____**

SPENDTHRIFT STALLIONS, LLC, BEMAK, N.V.,
d/b/a ASHFORD STUD, and THREE CHIMNEYS FARM, LLC.                    PLAINTIFFS

v.

THE JOCKEY CLUB and JONATHAN RABINOWITZ, and
MARC GUILFOIL, IN THEIR CAPACITIES AS CHAIRMAN
AND EXECUTIVE DIRECTOR OF THE KENTUCKY HORSE
RACING COMMISSION.                                                  DEFENDANTS

## COMPLAINT

Plaintiffs, Spendthrift Stallions, LLC, Bemak, N.V., d/b/a Ashford Stud and Three

Chimneys Farm, LLC, for their Complaint against The Jockey Club and Jonathan Rabinowitz and

Marc Guilfoil, in their capacities as chairman and executive director of the Kentucky Horse Racing

Commission, allege and state as follows:

### NATURE OF THE CASE

1.      The Jockey Club, through its Stewards, acts as the sole registry of Thoroughbreds

in North America.  An owner cannot enter a horse in a Thoroughbred race throughout the United

States without the horse's Jockey Club registration certificate.  As a result, the States have ceded

to The Jockey Club and its Stewards, through their control over the registry, the power to determine

what horses can run in Thoroughbred races.

2.      Recently, in a blatant abuse of that power, The Jockey Club Board of Stewards

adopted new Rule 14C of *The American Stud Book Principal Rules and Requirements*, which, by

placing a limit on the number of mares which a Thoroughbred stallion may breed per year (the

"Stallion Cap"), allows the Stewards to enforce an anti-competitive restraint upon the breeding

decisions of their competitors in the Thoroughbred horse business.

3.     Under the Stallion Cap, The Jockey Club, through its Stewards, has arbitrarily determined that it will refuse to register certain horses which are indisputably Thoroughbreds. Specifically, The Jockey Club will not register any foals that are not the product of the sire's breeding with the first 140 broodmares to which that stallion is bred in any given year.

4.     Presently, as a result of the operation of the free market, numerous Thoroughbred stallions in Kentucky and throughout the United States are bred to more than 140 mares per year.

5.     The refusal of The Jockey Club to register a Thoroughbred horse completely devalues that horse on the open market, because it cannot run in Thoroughbred races or breed other Thoroughbred racehorses.  Thus, the Stallion Cap effectively limits the number of mares to which an owner can economically breed its stallion to the number, 140 per year, that the nine Jockey Club Stewards have mandated.

6.     As a result, the highest quality Thoroughbred horses will be bred less times than market economics would otherwise dictate.  Hundreds of millions of dollars of stud fee revenues will be impacted; all owners of mares will pay higher prices to breed their mares; and less well-connected owners of mares will be precluded entirely from access to high quality stallions. In addition, owners of the premiere Thoroughbred stallions and stallion prospects will potentially move or sell their horses out of Kentucky to other countries whose Thoroughbred registries do not impose any Stallion Cap (every other country in the world besides the United States).

7.     The Stallion Cap serves no legitimate purpose and has no scientific basis.  Rather than facilitating the soundness of the Thoroughbred breed, the Stallion Cap was instead adopted to serve the economic interests of a discrete group of participants in the Thoroughbred industry to the detriment of the more competitive participants, *inter alia,* by artificially diverting breedings

away from more popular to less popular stallions and by artificially capping the bidding price at which top stallion prospects can be purchased.

8.      Many of the Stewards that adopted the Stallion Cap and that currently serve on the Jockey Club Board of Stewards themselves have conflicting economic interests – owning and/or representing various competing racing and breeding private entities, such as Stonestreet Farm, Cheyenne Stables, St. Elias Stables, Jump Sucker Stable, TIC Stables, Ocala Stud, Darby Dan Farm, and Lane's End Farm, whose economic interests will be served by the Stallion Cap.

9.      Plaintiffs seek to prevent The Jockey Club, through its Stewards, from misusing its authority to favor certain participants in the Thoroughbred market, including a number of the Stewards, over others and to preserve the rights of the owners of Thoroughbred stallions to conduct their business in a free market unrestrained by artificial limits on commerce.

## THE PARTIES

10.      Plaintiff Spendthrift Stallions, LLC ("Spendthrift") is, and was at all times relevant hereto, a limited liability company residing at 884 Iron Works Pike, Lexington Kentucky 40511. Spendthrift owns and operates a Thoroughbred stallion breeding operation in Fayette County, Kentucky.  Spendthrift and its affiliated companies own and operate a worldwide Thoroughbred horse breeding business, including in Kentucky and Australia; Spendthrift is engaged in the business of breeding Thoroughbred horses; and Spendthrift regularly buys, sells and stands Thoroughbred horses at stud.  Spendthrift also owns numerous Thoroughbred mares that it breeds to Thoroughbred stallions.

11.      Plaintiff Bemak, N.V. is, and was at all times relevant hereto, a limited liability company doing business in the United States as Ashford Stud ("Ashford Stud").  Ashford Stud resides at 5095 Frankfort Road, Versailles Kentucky 40383.  It owns and operates a worldwide

3

Thoroughbred horse breeding business, including in the United States and Kentucky; it is engaged in the business of breeding Thoroughbred horses; and it regularly buys, sells and stands Thoroughbred horses at stud.  Ashford Stud also owns numerous Thoroughbred mares that it breeds to Thoroughbred stallions.

12.     Plaintiff, Three Chimneys Farm, LLC ("Three Chimneys"), is and was at all relevant times hereto, a limited liability company residing at 1981 Old Frankfort Pike, Versailles Kentucky 40383. Three Chimneys owns and operates a Thoroughbred stallion breeding operation in Woodford County, Kentucky; it is engaged in the business of breeding Thoroughbred horses; and it regularly buys, sells and stands Thoroughbred horses at stud.  Three Chimneys also owns numerous Thoroughbred mares that it breeds to Thoroughbred stallions.

13.     The Defendant The Jockey Club is, and was at all times relevant hereto, a New York corporation licensed to do business and doing business in the Commonwealth of Kentucky, with its principal place of business located at 40 East 52nd Street, 15th Floor, New York, New York 10022.   Virtually all of The Jockey Club's members are private participants in the thoroughbred racing and breeding industry.

14.     Defendants Jonathan Rabinowitz and Marc A. Guilfoil are the Chairman and the Executive Director of the Kentucky Horse Racing Commission (the "KHRC"), respectively, and they are sued solely in their official capacities for the KHRC.  The KHRC is an agency of the Commonwealth of Kentucky created under Chapter 230 of the Kentucky Revised Statutes. The KHRC is empowered by Chapter 230 to, among other things, exercise all administrative functions of the Commonwealth of Kentucky in relation to horse racing. Pursuant to this authority, the KHRC promulgates and enforces various administrative regulations including but not limited to

810 KAR 4:010.  The Attorney General of the Commonwealth of Kentucky is being served with this Complaint at 700 Capitol Avenue, Frankfort, Kentucky 40601.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over the claims herein pursuant to 28 U.S.C. §§ 1331, 1337, and 1367, in that the Complaint alleges federal claims as well as state law claims over which this Court has supplemental jurisdiction.

16.     Venue is proper in this District and in this Division because a substantial part of the events giving rise to the claims herein occurred in this District and in this Division and because the Defendants reside in this District and this Division.

## FACTUAL ALLEGATIONS

17.     The Thoroughbred is a unique, purebred breed of horse.  Thoroughbred horses are prized for their speed, agility, and exertion.  As a result, the breed is closely associated with horse racing.  Other horse breeds or mixed breeds do not share the same characteristics and therefore are not substitutes for Thoroughbred horses.

18.     Thoroughbred horses are bought and sold as well as bred. In 2019, auction sales of Thoroughbred horses totaled over $1.075 billion in the United States.  Many of these sales occurred across state lines.  On the breeding side, roughly 20,000 Thoroughbred foals are born annually in North America.  Many breedings are subject to stud fees, a price paid to have a Thoroughbred stallion cover a Thoroughbred mare.  Stud fees can vary dramatically, from the low four figures to hundreds of thousands of dollars for a highly regarded Thoroughbred stallion.  Stud fees frequently involve breedings across state lines.

19.     Thoroughbred horse racing is a specialized type of horse racing, both as a practical matter and through public or private regulation.  As a practical matter, other horse breeds or mixed

breeds could not compete effectively in the type of racing at which Thoroughbreds excel. Moreover, as described in more detail below, entry into the type of racing at which Thoroughbreds excel is generally limited to registered Thoroughbred horses.  In 2019, purses for Thoroughbred races in the United States alone totaled over $1.1 billion.

20.     The original Jockey Club was formed in England prior to 1850 and enacted rules for the conduct of organized Thoroughbred racing in England.  The American Jockey Club ("The Jockey Club") was formed in New York in 1894.  Membership in The Jockey Club was and remains only by invitation by the Stewards, who themselves are replaced solely by designation by the Stewards.

21.     *The American Stud Book* was organized in 1868 by Col. Sanders Bruce, who published the first six volumes.  The Jockey Club purchased and/or acquired custody and control of *The American Stud Book* in 1896 and is now the exclusive organization for registering and maintaining records of Thoroughbred horses in the United States, Canada and Puerto Rico.

22.     The Jockey Club writes and publishes *The American Stud Book Principal Rules and Requirements.*  The rules and requirements for registering Thoroughbred horses are set forth in The Jockey Club Rule Book, at Section V, Rules 1-21.

23.     Until recently, The Jockey Club would issue a certificate to any foal produced from the live cover of a registered Thoroughbred mare by a registered Thoroughbred stallion, regardless of the number of mares to which the stallion had been bred.  In 2019, there were 43 stallions that each covered more than 140 mares; in 2020 there were 42 stallions that each covered more than 140 mares.

24.     Plaintiffs stand numerous stallions at their Kentucky farms that cover substantially more than 140 mares per year.

6

25.     The Jockey Club certificate, registering a foal produced by a live cover of a registered Thoroughbred mare by a registered Thoroughbred stallion, allows such horse to race in Thoroughbred races in Kentucky and in every other United States jurisdiction allowing Thoroughbred racing.  Without such certificate, a horse is ineligible to race in Thoroughbred races anywhere in this country and it has no value on the market.

26.     On May 7, 2020, The Jockey Club adopted its new Rule 14C, which places a limit on the number of mares which a Thoroughbred stallion may breed in any given year (the "Stallion Cap").  Under this new rule, The Jockey Club will not register and issue a certificate to any foals, sired by a stallion born after 2019, that are not the product of the sire's breeding with the first 140 broodmares to which that stallion is bred in any given year.

27.     In Kentucky, horse racing is regulated and governed by the KHRC, an independent agency of state government attached to the Environmental and Public Protection Cabinet for administrative purposes. *See* KRS 230.225. The KHRC was created to regulate the conduct of horse racing and pari-mutuel wagering on horse racing, and related activities within the Commonwealth of Kentucky. KRS 230.225; KRS 230.215. The Authority of the KHRC is set forth in KRS 230.260 and includes the authority to prescribe necessary and reasonable administrative regulations and conditions under which horse racing at a horse race meeting shall be conducted in this state.

28.     Pursuant to 810 KAR 4:010, Section 2, promulgated by the KHRC, and pursuant to KRS 230.210, administered by the KHRC, a Thoroughbred horse cannot race in Kentucky unless that horse is duly registered in the registry office of The Jockey Club.

29.     As a result, the effect of the new Jockey Club Rule 14C, as adopted by the KHRC to govern eligibility for Kentucky Thoroughbred races, is to preclude any foals sired by a stallion

born after 2019 that are not the product of the sire's breeding with the first 140 broodmares to which that stallion is bred in any given year from ever entering a Thoroughbred race in Kentucky.

30.     Moreover, the effect of the new Jockey Club Rule 14C is the same outside of Kentucky, as all other racing jurisdictions in the United States condition a horse's eligibility to enter a Thoroughbred race on registration by The Jockey Club.

31.     As a result of the foregoing, new Jockey Club Rule 14C will completely devalue any foals sired by a stallion born after 2019 that are not the product of the sire's breeding with the first 140 broodmares to which that stallion is bred in any given year — effectively eliminating the economic viability of any such foals.  Moreover, new Jockey Club Rule 14C will substantially diminish the value of any stallion to which that rule applies, by limiting the number of stud fees that can be generated by such stallion on the open market.

32.     Kentucky law does not clearly articulate or affirmatively express any policy to limit Thoroughbred breedings.  The Kentucky regulation that delegates registration authority to The Jockey Club, 810 KAR 4:010, says nothing about limiting breeding and instead describes its purpose as "establish[ing] requirements for the participation of horses in horse race meetings, protect[ing] the safety and welfare of the horse, and create[ing] a level playing field for participants thereby protecting the integrity of pari-mutuel wagering."

33.     Neither the KHRC nor any other governmental authority supervises The Jockey Club's or its Stewards' decisions regarding registry of Thoroughbred horses.  Neither the KHRC nor any other governmental authority has any authority to override or modify any decision or rule-making by The Jockey Club with respect to registration of Thoroughbred horses.  The public notice and comment and agency approval procedures generally applicable to government rulemaking are

wholly lacking.  In short, the Jockey Club is exercising delegated governmental authority without any guidance for or oversight of the exercise of that authority.

34.     If Rule 14C had been applied in 2019, the breedings of 43 stallions would have been restricted and over $85,000,000 in stud fee revenues would have been impacted for that year alone.  Similarly, if Rule 14C had been applied in 2020 to stallions born before 2020, the breedings and stud fee revenues would have been similarly restricted.

35.     Moreover, as a result of the foregoing, new Jockey Club Rule 14C has already diminished the value of the 2020 weanlings acquired by Plaintiffs, whose future productivity as stallions will be artificially limited by that Rule, and it has already diminished the value of Plaintiffs' current crop of stallions as the potential productivity of the foals they produce will be limited by that Rule.

36.     At all times relevant hereto, The Jockey Club was acting pursuant to the authority granted to it by the Commonwealth of Kentucky and on behalf of the KHRC.  Moreover, the value of a Jockey Club registration certificate derives substantially from the power that the KHRC has delegated to the Jockey Club to determine eligibility to race in a Kentucky Thoroughbred race.

37.     In 2019, 8,053 Kentucky born foals were registered with The Jockey Club at the requisite fee of $225 per foal, generating approximately $1,811,925 in revenue for The Jockey Club.  In 2020, 6495 Kentucky born foals were registered with The Jockey Club at the requisite fee of $225 per foal, generating approximately $1,461,375 in revenue for The Jockey Club.  Over the past 20 years, an average of approximately 30,000 foals born in the United States, Canada and Puerto Rico have been registered each year with The Jockey Club, generating registration fee revenues in excess of $100 million.  In addition, The Jockey Club has leveraged the commercial

power it exercises as the State sponsored registry of Thoroughbred horses into numerous other related profit-making ventures.

38.     The Jockey Club has also leveraged its power over the North American Thoroughbred industry by unlawfully conspiring with other registries throughout the world to expand the geographical reach of its rules.  The International Stud Book Committee ("ISBC") was formed in 1976 by the Thoroughbred registries of several major Thoroughbred-breeding countries. As the Thoroughbred registries of other countries joined the ISBC, the ISBC decided to limit membership to a representative of single Thoroughbred registry per international region (e.g. Northern and Central American and Caribbean; Asian and Oceania).  The ISBC representative for a given region is charged with representing the various national registries in his region and to report on ISBC matters back to the national registries in his region.  The ISBC therefore consists of individuals, each of whom is affiliated with a Thoroughbred registry in a particular country and each of whom represents all the registries in his or her international region.

39.     Among other things, the ISBC makes decisions and rules applicable to its member registries.  One of the decisions and rules it has made concerns the definition of a Thoroughbred horse.  The ISBC, its individual representatives, and its member registries have agreed that each registry will recognize as a Thoroughbred those horses – and only those horses – that a member registry has registered as a Thoroughbred.  As a result, if The Jockey Club refuses to register a horse as a Thoroughbred for whatever reason, no registry associated with the ISBC will recognize that horse as a Thoroughbred.

40.     The ISBC, its individual representatives, and its member registries have also agreed that the ISBC will recognize only one "approved" registry per geographic region.  The Jockey Club is the only "approved" registry for the United States.

41.     As a result of these agreements among the ISBC, its individual representatives, and its member registries including The Jockey Club, a decision regarding Thoroughbred registration by The Jockey Club affects the horse in question and its owner not just in the United States, but worldwide:

- If The Jockey Club refuses to register a horse as a Thoroughbred, that horse will not only be prohibited from Thoroughbred races in the United States, but also in any other country with a registry affiliated with the ISBC (which includes all major racing jurisdictions in the world).

- If The Jockey Club refuses to register a horse as a Thoroughbred, neither that horse nor its offspring will be recognized as a Thoroughbred in any country with a registry affiliated with the ISBC (which includes all major Thoroughbred-breeding jurisdictions in the world).

42.     Given the collusive agreements among the ISBC, its individual representatives, and its member registries including The Jockey Club, these effects cannot be avoided by an owner of a U.S.-born horse that is genetically a Thoroughbred but not registered as such by The Jockey Club under the Stallion Cap.  Even if such a horse would be recognized as a Thoroughbred by some organization other than The Jockey Club, that recognition would be of little to no effect given that (a) registration by The Jockey Club is required to participate in Thoroughbred racing in the United states, (b) The Jockey Club's refusal to register the horse as a Thoroughbred means the horse could not participate in Thoroughbred racing in any major racing jurisdiction worldwide, and (c) the horse could not be registered as a Thoroughbred (and therefore neither could its offspring) in any major racing or breeding jurisdiction in the world.

43.     Given these consequences, the ISBC's one-registry-per-country rule extends the anticompetitive effect of the Stallion Cap to an international dimension.  U.S.-born horses that are Thoroughbreds from a genetic perspective, but which are subject to the arbitrary Stallion Cap, cannot race and therefore cannot earn purse money in any major racing jurisdiction in the world because of the combined effect of the Stallion Cap and one-registry-per-country rule.  U.S.-born stallions that are Thoroughbreds from a genetic perspective, but which are subject to the arbitrary Stallion Cap, cannot be bred in any major Thoroughbred-breeding jurisdiction in the world because of the combined effect of the Stallion Cap and one-registry-per-country rule.  U.S.-born stallions that are Thoroughbreds from a genetic perspective, but which are subject to the arbitrary Stallion Cap, cannot as a practical matter be sold in any major Thoroughbred-breeding jurisdiction in the world because of the combined effect of the Stallion Cap and one-registry-per-country rule.  As a result, U.S.-born horses that are Thoroughbreds from a genetic perspective, but which are subject to the arbitrary Stallion Cap, and their offspring are significantly devalued and their owners are consequently harmed – all because of The Jockey Club's Stallion Cap and the one-registry-per-country rule, which enforces and extends the impact of the Stallion Cap internationally.

### *COUNT I* (UNCONSTITUTIONAL DELEGATION OF POWER BY THE KHRC TO THE JOCKEY CLUB)

44.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

45.     But for The Jockey Club's implementation, through its Stewards, of the Stallion Cap, Plaintiffs would have the ability to breed their Thoroughbred stallions as often as appropriate and economically advantageous, and the results of such breedings would be eligible to race in Thoroughbred races in Kentucky and to be used in the production of additional Thoroughbred foals.

12

46.     Without the registration by The Jockey Club of all of the foals produced by a Thoroughbred stallion within a particular year, Plaintiffs' ability to sell the services of their stallions is seriously curtailed, because potential customers cannot race or breed the foals produced in excess of the limit arbitrarily chosen by The Jockey Club. The value of the Plaintiffs' stallions is thus negatively impacted by the Stallion Cap.

47.     Plaintiffs have a liberty and property interest in their rights to breed their stallions in Kentucky as they see fit and as the market will bear, and to sell, breed or race the offspring of those stallions.

48.     By virtue of 801 KAR 4:010 and KRS 230.210, the Commonwealth of Kentucky by and through the KHRC grants to The Jockey Club the exclusive right to register a Thoroughbred horse, which determines the ability of that horse to enter Thoroughbred races in Kentucky.  KHRC has delegated that authority to The Jockey Club without providing any objective criteria for the granting or denying of registration.  Thus, in its absolute and sole discretion, The Jockey Club may permit or deny the registration of any Thoroughbred horse and the entry of such horse into a Kentucky Thoroughbred race without reference to any standards except those established by The Jockey Club.

49.     Delegating such power to the Jockey Club effectively gives that private organization and its Stewards the power to regulate the business of their competitors.

50.     The decision of The Jockey Club to refuse registration of Thoroughbred foals sired by a stallion born after 2019 that are not the product of the sire's breeding with the first 140 broodmares to which that stallion is bred in any given year is arbitrary, irrational and capricious and serves no legitimate state interest.  It is also anti-competitive and an unlawful taking of the Plaintiffs' property rights, causing them financial harm.

13

51.     The power to regulate the business of Thoroughbred breeding is a legislative power that has not been lawfully delegated to the KHRC or to The Jockey Club.

52.     By its new Rule 14C, The Jockey Club is not fulfilling an administrative function of merely identifying and registering, for the KHRC, those horses that qualify as purebred Thoroughbred horses; instead, the Jockey Club is making its registration decisions, and rejecting actual Thoroughbred horses, based on whether its Stewards approve of the breeding decisions of the horse's owners.

53.     Moreover, by applying whatever registration criteria the Jockey Club might adopt, and by applying new Rule 14C without implementing any new regulation, the KHRC is delegating to The Jockey Club complete and unfettered discretion to regulate entry into Kentucky horse racing.

54.     The delegation by the KHRC to The Jockey Club of the power to regulate breeding of Thoroughbred horses in Kentucky, through its continued adoption, pursuant to 801 KAR 4:010 and KRS 230.210, of new Jockey Club Rule 14C in determining a Thoroughbred horse's eligibility to race in a Kentucky Thoroughbred race, is an unconstitutional delegation to the Jockey Club and its Stewards of the power to regulate the breeding decisions of its competitors in the Thoroughbred horse business.

55.     KRS 230.210 and 801 KAR 4:010, as enacted and as applied by the Defendants to Plaintiffs, violate Sections 2 and 29 of the Kentucky Constitution and are an unconstitutional delegation of power to The Jockey Club.

### COUNT II (VIOLATION OF KENTUCKY CONSTITUTION SECTIONS 1, 2, 3 AND 8 BY THE KHRC AND THE JOCKEY CLUB)

56.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

57.     By virtue of KRS 230.210 and 810 KAR 4:010, the Commonwealth of Kentucky by and through the KHRC has given force to The Jockey Club Stewards' decision to deny Plaintiffs the right to the use of their property in commerce through the Stallion Cap, which decision is fairly attributable to the Commonwealth of Kentucky.

58.     As a result of the power granted to The Jockey Club and its registry by 801 KAR 4:010, the adoption of new Rule 14C by The Jockey Club constitutes state action for purposes of establishing constitutional violations.

59.     The application, by the KHRC, of The Jockey Club's new Rule 14C in governing entry into Kentucky Thoroughbred races constitutes state action for purposes of establishing constitutional violations.

60.     The effective denial of Plaintiffs' right to breed their stallions, by virtue of new Jockey Club Rule 14C as adopted and implemented by the KHRC through KRS 230.210 and 810 KAR 4:010, denies Plaintiffs a fundamental property right and is arbitrary, irrational and capricious and serves no legitimate state interest.

61.     New Jockey Club Rule 14C as adopted and implemented by the KHRC through KRS 230.210 and 810 KAR 4:010 does not tend to protect or preserve the public health, morals, safety or the general welfare of the people of the Commonwealth of Kentucky.  Indeed, rather than promoting health and safety, the real purpose and effect of the challenged Rule is economic protectionism, that is, *inter alia,* to usurp, for the benefit of owners of less popular stallions, the breedings that would, under free market conditions, have otherwise gone to the more popular stallions and to cap the purchase price for the top stallion prospects, thereby artificially benefitting less competitive purchasers in the bidding for those stallion prospects (e.g., horse farms that are unable or unwilling to breed their stallions to more than 140 mares in a year) – all at the expense

of the more competitive purchasers and the sellers of those stallion prospects.  Indeed, at least one Jockey Club Steward has publicly acknowledged that economic protectionism – rather than any interest in curtailing inbreeding among thoroughbreds – is the real purpose behind the Rule.

62.     There is no scientific basis or support for the avowed purpose behind the Jockey Club's Stallion Cap, that is, to promote genetic diversity in the Thoroughbred breed.  The Jockey Club Stewards have refused to provide to the public or even to its members any scientific studies that purport to support its decision to implement the Stallion Cap.  No other country has found a basis for introducing a Stallion Cap, and the Thoroughbred registry entities in all other countries have determined that further scientific study is required before such a Rule is considered. The Stallion Cap is not designed to have any material impact on Thoroughbred genetic diversity as there were only 43 stallions in 2019 and only 42 stallions in 2020 that were bred to over 140 mares, and the Stallion Cap simply means that excess demand will move on to the next most popular stallions who share similar genetics. Moreover, there have been no scientific studies to demonstrate that the existing level of inbreeding in the Thoroughbred breed is at a level that compromises the health and well-being of the breed or has caused any negative traits to occur or that expected changes in inbreeding from existing matings will cause any negative traits to occur.

63.     The Jockey Club's arbitrary, capricious and inconsistent application and enforcement of the Stallion Cap generally, and to Plaintiffs, treats the owners of Thoroughbred stallions who breed their stallions more than 140 mares per year, and the owners of the offspring of Thoroughbred stallions that result from breedings in excess of 140 mares, differently and unfairly as compared to other Thoroughbred horse owners in Kentucky, without rational basis.

64.     Thus, new Jockey Club Rule 14C as adopted and implemented by the KHRC through 810 KAR 4:010, as enacted and applied by the Defendants to Plaintiffs, violates the due

process and equal protection rights of the Plaintiffs as guaranteed by Sections 1, 2, 3 and 8 of the Kentucky Constitution.

65.     As a result, Plaintiffs are entitled to injunctive relief prohibiting Defendants and their agents and employees from enforcing or abiding by the Stallion Cap and to damages.

### COUNT III (VIOLATION OF FIFTH AND FOURTEENTH AMENDMENTS TO UNITED STATES CONSTITUTION AND OF THE DORMANT COMMERCE CLAUSE BY THE KHRC AND THE JOCKEY CLUB)

66.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

67.     New Jockey Club Rule 14C as adopted and implemented by the KHRC through KRS 230.210 and 810 KAR 4:010, as enacted and applied by the Defendants to Plaintiffs, violates the due process and equal protection rights of the Plaintiffs as guaranteed by the Fifth and the Fourteenth Amendments to the United States Constitution, and it violates the Dormant Commerce Clause of the United States Constitution as well.

68.     Plaintiffs' interests in their Thoroughbred horses and their right to generate fees from the breeding and sale of such horses are protected property rights under the Fifth Amendment of the United States Constitution, as made applicable to the states by the Fourteenth Amendment to the United States Constitution.

69.     New Jockey Club Rule 14C as adopted and implemented by the KHRC through KRS 230.210 and 810 KAR 4:010 does not tend to protect or preserve health or safety; instead, its sole purpose is economic protectionism; it is designed to protect the economic interests of owners of second tier stallions who will usurp the breedings that would, under free market conditions, have otherwise gone to the first tier stallions but for the imposition of that Rule.  Indeed, at least

one Jockey Club Steward has publicly stated that economic protectionism – rather than any interest in curtailing inbreeding among thoroughbreds – is the real purpose behind the Rule.

70.    The Jockey Club's arbitrary, capricious and inconsistent application and enforcement of the Stallion Cap generally, and to Plaintiffs, treats the owners of Thoroughbred stallions who breed their stallions more than 140 mares per year, and the owners of the offspring of Thoroughbred stallions that result from breedings in excess of 140 mares, differently and unfairly as compared to other Thoroughbred horse owners in Kentucky, without rational basis.

71.    Moreover, new Jockey Club Rule 14C as adopted and implemented by the KHRC through KRS 230.210 and 810 KAR 4:010 violates the dormant commerce clause because it is aimed at economic protectionism and it imposes a burden on interstate commerce that is clearly excessive in relation to the putative benefits that it claims to promote.

72.    In addition, Defendants' actions in imposing and abiding by the Stallion Cap constitute an impermissible taking of Plaintiffs' property interests.

73.    Plaintiffs had a reasonable expectation that they could continue to conduct their Thoroughbred breeding business in accordance with the recognized standards for production of Thoroughbred foals, *i.e.*, a live cover by a registered Thoroughbred stallion of a registered Thoroughbred mare.

74.    Defendants have offered no compensation for the loss of Plaintiffs' protected interests nor any means of seeking such compensation.

75.    As a result, Plaintiffs are entitled to injunctive relief prohibiting Defendants and their agents and employees from enforcing or abiding by the Stallion Cap and to damages.

## COUNT IV (VIOLATION OF 42 U.S.C. § 1983 BY THE KHRC
## AND THE JOCKEY CLUB)

76.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

77.     Plaintiffs seek an award of injunctive relief and compensatory and punitive damages pursuant to 42 U.S.C. §1983 and attorney's fees pursuant to 42 U.S.C. §1981.

## COUNT V (DECLARATORY JUDGMENT)

78.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

79.     Pursuant to 28 U.S.C. § 2201, an actual controversy exists between the Plaintiffs and the Defendants concerning the enforcement of the Stallion Cap.

80.     Plaintiffs seek a declaration that KRS 230.210 and 810 KAR 4:010 are unconstitutional delegations of power to The Jockey Club.

81.     Plaintiffs seek a declaration that The Jockey Club's refusal to register the offspring of Thoroughbred stallions resulting from any breedings other than the first 140 mares, as applied by the KHRC to limit entry to Kentucky Thoroughbred races, is arbitrary and capricious and violates the due process rights and the equal protection rights guaranteed to Plaintiffs under the Kentucky and the United States Constitutions.

82.     Plaintiffs seek a declaration that The Jockey Club's refusal to register the offspring of Thoroughbred stallions resulting from any breedings other than the first 140 mares, as applied by the KHRC to limit entry to Kentucky Thoroughbred races, deprives Plaintiffs' of their property without due compensation and constitutes an illegal taking under the Fifth and Fourteenth Amendments to the United States Constitution.

83.     Plaintiffs seek a declaration that The Jockey Club's refusal to register the offspring of Thoroughbred stallions resulting from any breedings other than the first 140 mares, as applied by the KHRC to limit entry to Kentucky Thoroughbred races, violates the dormant commerce clause of the United States Constitution.

### COUNT VI (INJUNCTIVE RELIEF AGAINST THE JOCKEY CLUB)

84.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

85.     As a result of The Jockey Club's arbitrary and capricious action in imposing the Stallion Cap, Plaintiffs have suffered, are suffering, and will continue to suffer immediate and irreparable harm for which, absent injunctive relief, there is no adequate remedy at law.

86.     Plaintiffs request that this Court grant them preliminary and permanent injunctive relief prohibiting The Jockey Club from imposing the Stallion Cap and refusing to register authentic Thoroughbred foals as such regardless of the number of times that the foals' stallions have been bred in a particular season.

### COUNT VII (INJUNCTIVE RELIEF AGAINST THE KHRC)

87.     The Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

88.     As a result of the KHRC's actions to arbitrarily and capriciously deny the registration of thoroughbred foals based on the number of mares bred by their stallions, and thus prevent those foals from racing in the Commonwealth of Kentucky or being bred in the future, Plaintiffs have suffered, are suffering, and will continue to suffer immediate and irreparable harm for which, absent injunctive relief, there is no adequate remedy at law.

89.     Plaintiffs request that this Court grant them preliminary and permanent injunctive relief requiring the KHRC, through its Chairman and Executive Director, to utilize a method other than registry with the Jockey Club to determine eligibility to race in Thoroughbred races in Kentucky.

### COUNT VIII (VIOLATION OF THE SHERMAN ANTITRUST ACT, 15 U.S.C. § 1, AGAINST THE JOCKEY CLUB)

90.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

91.     The Thoroughbred Horse Market is the relevant product market.  Thoroughbred horses are bred, bought, and sold in this market, which implicates interstate commerce.  As explained above, Thoroughbred horses are not reasonably interchangeable with other horse breeds or mixed breeds, and only registered Thoroughbred horses can compete in Thoroughbred horse racing in the United States.

92.     The United States is the relevant geographic market.  There are sales and breedings of Thoroughbred horses across national boundaries, but the level of international activity is limited to elite horses and does not have a significant impact on the Thoroughbred market as a whole in the United States.

93.     The Jockey Club's Stewards enacted Rule 14C.  The Stewards represent numerous different stables that participate in the Thoroughbred market and the Thoroughbred Racing market and that compete with the Plaintiffs: Stonestreet Farm, Cheyenne Stables, St. Elias Stables, Jump Sucker Stable, TIC Stables, Ocala Stud, Darby Dan Farm, and Lane's End Farm.

94.     The Stewards, and the stables they represent, each have economic interests separate from those of The Jockey Club.  For example, The Jockey Club earns revenue through registration of Thoroughbred horses.  The more Thoroughbreds that are registered, the more of this revenue is

earned by The Jockey Club.  Jockey Club Rule 14C, however, will reduce the number of Thoroughbred breedings and will therefore reduce registration revenue earned by The Jockey Club. The Jockey Club's Stewards and the stables with which they are affiliated, on the other hand, have differing economic interests.

95.    Given the differing economic interests of the Stewards and The Jockey Club, their collective action in adopting Jockey Club Rule 14C eliminates independent centers of economic decision-making and constitutes concerted action for purposes of § 1 of the Sherman Antitrust Act.

96.    The Stewards, collectively engaged in concerted action through The Jockey Club, have possessed market power in the Thoroughbred Horse Market at all relevant times.  As described above, throughout the United States, The Jockey Club alone qualifies horses as Thoroughbreds.  The Jockey Club therefore controls access to the Thoroughbred Horse Market and serves as the gatekeeper for all Thoroughbred races in the United States.

97.    Jockey Club Rule 14C will unlawfully restrain trade in the Thoroughbred Horse Market in at least the following ways:

- Owners of Thoroughbred stallions will, as a practical matter, be precluded from breeding those stallions more than 140 times per year, regardless of market demand or other relevant considerations;

- Any Thoroughbred foal conceived from a Thoroughbred stallion's 141st or higher cover in a given year will be of little to no economic value to its owner given the inability to register that horse as a Thoroughbred and inability to race that horse in Thoroughbred races;

- Fewer Thoroughbred horses will be bred than market economics would otherwise dictate;

- The supply of Thoroughbred stallions available for breeding will be artificially reduced because of the cap on annual breedings;

- The value of Thoroughbred stallions born in 2020 and beyond will be reduced below market valuations because of the artificial limit on how often they can be bred;

- The value of Thoroughbred stallions born before 2020 is reduced below market valuations because of the artificial limit on the ability of their offspring to breed;

- Owners of Thoroughbred stallions will receive a lower overall number of stud fees; and

- Fewer horses will be eligible to participate in Thoroughbred races.

98.  Neither the Commonwealth of Kentucky, nor any other U.S. jurisdiction, has a clearly articulated state policy in favor of the suppression of competition that flows from the Stallion Cap.  Neither the Commonwealth of Kentucky, nor any other U.S. jurisdiction, actively supervises The Jockey Club in relation to its adoption of rules, like the Stallion Cap, regulating the registration of Thoroughbreds or in relation to its interactions with the ISBC, its individual representatives, or other ISBC member registries.

99.  The Jockey Club has conspired with the ISBC, its individual representatives, and other ISBC-"approved" registries to enforce the ISBC's one-registry-per-country-rule, the effect of which is to extend the effect of the Stallion Cap from one with domestic anticompetitive effects to one with international anticompetitive effects for U.S.-born horses and their owners.  This collusion among the ISBC, its individual representatives, and its member registries (including The Jockey Club) means that owners of U.S.-born horses harmed by the Stallion Cap cannot avoid the

anticompetitive effects of the Stallion Cap by racing, breeding, or selling those horses overseas. Consequently, all of the anticompetitive effects of the Stallion Cap described above are amplified by the one-registry-per-country rule and its enforcement by the ISBC's member registries.

100.    The Plaintiffs' existing and future injuries flow from these anticompetitive effects of Jockey Club Rule 14C on the Thoroughbred Horse Market and the enforcement of Rule 14C via the one-registry-per-country rule.  These collusive agreements have already diminished the value of the 2020 weanlings acquired by Plaintiffs, because those weanlings' future productivity as stallions will be artificially limited by the Stallion Cap and the one-registry-per-country rule. The Stallion Cap and the one-registry-per-country rule have already diminished the value of Plaintiffs' current crop of stallions as the potential productivity of the foals they produce will be limited by the Stallion Cap and the one-registry-per-country rule.  In the future, the Stallion Cap and the one-registry-per-country rule will lower the number of stud fees received by the Plaintiffs and will reduce the value of the offspring of the Plaintiffs' current stables of Thoroughbred horses.

### *COUNT IX* (VIOLATION OF THE KENTUCKY CONSUMER PROTECTION ACT AGAINST THE JOCKEY CLUB)

101.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

102.    The restraint of trade described in Count VIII also violates the Kentucky Consumer Protection Act, K.R.S. 367.175.

WHEREFORE, Plaintiffs respectfully requests judgment on Counts I through IX against the Defendants for the following relief:

1.      For a declaration that KRS 230.210 and 810 KAR 4:010 are unconstitutional to the extent they delegate to The Jockey Club the absolute and discretionary power to register all Thoroughbred horses.

2.     For a declaration that KRS 230.210 and 810 KAR 4:010, as applied against Plaintiffs, are arbitrary and capricious and violate their due process and equal protection rights guaranteed by the Kentucky and the United States Constitutions and that they violate the dormant commerce clause of the United Sates Constitution.

3.     For an injunction requiring the KHRC, through its Chairman and Executive Director, to permit Thoroughbreds to race in Kentucky regardless of their inclusion in the Jockey Club registry;

4.     For an injunction requiring The Jockey Club to repeal its Rule 14C or, in the alternative, permanently prohibiting The Jockey Club from enforcing its Rule 14C and from denying registration on account of the number of mares covered by any horse's sire.

5.     Compensatory and punitive damages against The Jockey Club;

6.     Treble damages against The Jockey Club;

7.     Pre- and post-judgment interest;

8.     Reasonable attorney's fees and costs of suit;

9.     Trial by jury on all claims so triable; and

10.    For all other relief to which the Plaintiff may appear entitled.

Respectfully submitted,

**Of Counsel for Plaintiffs:**

Matthew C. Blickensderfer
(*Pro Hac Vice* Application to be filed)
Frost Brown Todd, LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, OH  45202
Tel.:   (513) 651-6800
Fax:   (513) 651-6981
mblickensderfer@fbtlaw.com

/s/ Barry D. Hunter
Barry D. Hunter
Medrith Lee Norman
Frost Brown Todd LLC
250 West Main Street, Suite 2800
Lexington, KY  40507
Tel.:   (859) 231-0000
Fax:   (859) 231-0011
bhunter@fbtlaw.com
mnorman@fbtlaw.com

**Counsel for all Plaintiffs**

/s/ W. Craig Robertson III (with permission
W. Craig Robertson III, Esq.
Wyatt, Tarrant & Combs, LLP
250 West Main Street, Suite 1600
Lexington, KY  40507
Tel.:   (859) 233-2012
Fax:   (859) 259-0649
wrobertson@wyattfirm.com

**Counsel for Spendthrift Stallions, LLC**

Date:  February 23, 2021.

BT05531.0725247   4817-1013-1925v1